IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| OCCUPATIONAL HEALTH CENTERS OF THE SOUTHWEST, P.A., D.B.A. CONCENTRA MEDICAL CENTERS | |
| *Plaintiff*, | |
| | Civil Action No. ELH-17-0975 |
| v. | |
| ROBERT TONEY, JR., M.D. | |
| *Defendant*. | |

## MEMORANDUM OPINION

In this Memorandum Opinion, I address a motion for preliminary injunction, seeking enforcement of a restrictive covenant against a physician.

On April 10, 2017, plaintiff Occupational Health Centers of the Southwest, P.A., d/b/a Concentra Medical Centers ("Concentra") filed suit against defendants Robert Toney, Jr., M.D. and Workpro Holdings, LLC., d/b/a Workpro Occupational Health, now known as PTN Occupational Health Holdings, LLC ("Workpro").[1] ECF 1; *see also* ECF 6 at 1, n.1. Workpro is a subsidiary of Pivot Physical Therapy. *See* ECF 1-6 at 2.

Dr. Toney worked for Concentra from 2000 until his resignation in 2017. For most of that time, Concentra was the contractor for a particular State contract, discussed *infra*. However, the State recently awarded that contract to Workpro, a competitor of Concentra in the field of

---

[1] As discussed, *infra*, Workpro has since been dismissed from this suit (ECF 11), to preserve subject matter jurisdiction founded on diversity. *See* 28 U.S.C. § 1332.

occupational medicine. And, on or about April 10, 2017, Dr. Toney commenced employment with Workpro.

As to Dr. Toney, the Complaint (ECF 1) sets forth two "claims". The first is for "Temporary, Preliminary, and Permanent Injunction" and the second is for breach of contract.[2]

Concentra also submitted several exhibits with its suit. *See* ECF 1-1 to ECF 1-8. These include a "Physician Services Agreement" ("Agreement") executed by Dr. Toney, dated July 30, 2000. *See* ECF 1-4. In sum, the non-competition provision of the Agreement provides that, for a period of two years following the termination of Dr. Toney's employment with Concentra, Dr. Toney may not work for a competitor in the medical field of occupational medicine if it is within the "Prohibited Area."

According to Concentra, by working for Workpro, Dr. Toney has violated the non-compete provision of the Agreement. In Concentra's view, if Dr. Toney is permitted to work for Workpro, "those employers who came to rely on his skill set [at Concentra] will likely be inclined to move their business from Concentra to Workpro, which will cause Concentra irreparable harm." ECF 1, ¶ 5.

Along with its Verified Complaint (ECF 1), Concentra filed a "Motion for Temporary Restraining Order And Preliminary Injunction" (ECF 2), supported by a memorandum of law (ECF 2-1) (collectively, "Motion"). The Motion seeks to enjoin Dr. Toney from working for Workpro.[3]

---

[2] Concentra had asserted a claim against Workpro for tortious interference with contract.

[3] The Motion also seeks to enjoin the disclosure of Concentra's confidential information of Concentra and the solicitation of any Concentra customers. ECF 2 at 4-6. However, at this juncture, Concentra has not pursued these claims.

On April 13, 2017, while Workpro was still a party defendant, Dr. Toney and Workpro submitted a joint response in opposition to the Motion (ECF 6, "Opposition"), supported by the Affidavit of Dr. Toney (ECF 6-1) and another exhibit. ECF 6-2. Concentra replied (ECF 7, "Reply") and submitted an additional exhibit. ECF 7-1.

By Order dated April 14, 2017, docketed on April 17, 2017 (ECF 8), I directed plaintiff to clarify the basis for the Court's diversity jurisdiction. Given that Workpro is an LLC, I indicated that Concentra did not sufficiently demonstrate diversity of citizenship. *See Cent. W. Virginia Energy Co. v. Mountain State Carbon, LLC*, 636 F.3d 101, 103 (4th Cir. 2011) ("For purposes of diversity jurisdiction, the citizenship of a limited liability company . . . is determined by the citizenship of all of its members."); *see also Clephas v. Fagelson, Shonberger, Payne & Arthur*, 719 F.2d 92, 93 (4th Cir. 1983) (explaining that it is "hornbook law" that the citizenship of unincorporated entities is determined by the citizenship of all of its members).

On Monday, April 17, 2017, the Court convened an emergency hearing on the Motion. At that time, counsel agreed to proceed on the request for a preliminary injunction, rather than the request for a temporary restraining order. However, because counsel for the parties were unable to confirm the existence of diversity jurisdiction, the hearing was continued until Friday, April 21, 2017.

In the interim, the Court held a telephone conference with counsel on April 19, 2017. Plaintiff's counsel informed the Court that, in fact, Workpro and Concentra are not diverse because both entities possess members who are citizens of Texas. Thereafter, to preserve diversity jurisdiction, Concentra filed a notice of voluntary dismissal as to Workpro. ECF 10. By Order of April 20, 2017 (ECF 11), Workpro was dismissed from the case, without objection.

After the close of business on April 20, 2017, Dr. Toney submitted a supplemental response in opposition to the Motion. ECF 12 ("Supplemental Opposition"). It is supported by Dr. Toney's Supplemental Affidavit (ECF 14-2) and the Affidavit of Brian Shinkle, M.D., the Medical Director of Workpro (ECF 12-2), with exhibits. *See* ECF 12-2 at 4-8.

The Court held an evidentiary hearing on the Motion on April 21, 2017 ("Hearing"). At the Hearing, plaintiff called Dr. Toney as the sole witness and introduced additional exhibits. Both sides also relied on the exhibits that they had previously included with their written submissions.

At the conclusion of the Hearing, because of the urgency of the matter, I delivered a brief oral ruling, granting the Motion, in part, subject to plaintiff's satisfaction of the bond requirement and the submission of a proposed order that identified the locations of Concentra's offices in Maryland in 2000. I also informed counsel and the parties that a written ruling would follow, in order to supplement, clarify, and explain the oral ruling.[4]

## I. Factual Background[5]

### A. The Parties

Concentra is a Texas professional association with its principal place of business located in Addison, Texas. ECF 1, ¶ 7. Among other things, Concentra is "engaged in the business of Occupational Medicine." *Id.*, ¶ 16. Occupational Medicine is "a branch of occupational health

---

[4] The Court's oral ruling is incorporated here. To the extent that there is any inconsistency between the Court's ruling and this Memorandum Opinion, the Memorandum Opinion shall control.

[5] I do not have a transcript of the testimony presented at the Hearing. Therefore, as to Dr. Toney's testimony, I have relied on my notes. Because I do not have a transcript, to the extent that Dr. Toney's testimony is consistent with information presented in the exhibits or the pleadings, I have generally cited to the exhibits.

concerned with the prevention and treatment of workplace injuries, chronic illnesses, and diseases. Occupational Medicine clinicians assess workplace conditions and medical history to develop a treatment program by focusing on the physical and mental well-being of injured employees." *Id.*

Plaintiff operates occupational health clinics across the United States with board certified physicians trained in certain specialties, including public health, preventive medicine, family practice, toxicology, and medical research, among others. *Id.*, ¶ 17. Concentra also works with employers like the State of Maryland "to develop an effective treatment program for injured employees…." *Id.*

Of import here, Concentra "has been the incumbent contractor for every iteration of" an occupational medical services contract awarded by the State of Maryland "for at least the past fifteen years," to perform certain kinds of work evaluations for injured workers. ECF 1, ¶ 2. This contract is known as the *State Medical Director and Occupational Medical Services for Maryland State Agencies* (the "State Contract"). *Id.*; *see* ECF 1-3.

Dr. Toney, a Maryland resident, graduated from medical school in 1997. Hearing. He joined Concentra in 2000, upon completion of his medical residency. Hearing; ECF 1, ¶ 23. Dr. Toney is board certified in family medicine. *Id.*, ¶ 4. However, "[o]utside of his residency, which was completed over 16 years ago, Dr. Toney has never practiced in the area of family medicine." ECF 12 at 5. Rather, he spent over sixteen years practicing occupational medicine with Concentra. *Id.*

In 2006, Dr. Toney became Concentra's "Medical Director for Medical Advisory Services" as well as the "State Medical Director" ("SMD") under the State Contract. ECF 1, ¶ 2;

*see also id.*, ¶ 22.[6]  The SMD is "the principal physician for the State charged exclusively with performing workability evaluations for injured state workers and approving the use of leave banks for these employees."  ECF 1, ¶ 23.

Plaintiff claims that, in addition to Dr. Toney's work as SMD, Dr. Toney had other responsibilities.  Along with the services that Dr. Toney provided under the State Contract, Dr. Toney allegedly "provided Occupational Medicine care to patients through additional contracts with employer clients other than those serviced by the State Contract."  *Id.*, ¶ 25.  And, at the Hearing, Dr. Toney acknowledged that he has held other positions at Concentra.  He testified that between 2000 and 2006, before he became the SMD, he worked for Concentra in the position of Medical Director at two of its locations.

Following a competitive bidding process, the 2017 version of the State Contract ("2017 State Contract") was recently awarded to Workpro.  On February 15, 2017, after Concentra lost the 2017 State Contract to Workpro, Dr. Toney gave notice of his intention to resign from Concentra, effective April 7, 2017.  ECF 1, ¶ 35.  He commenced his employment with Workpro on April 10, 2017.  Dr. Toney testified that he now serves as the State Medical Director with Workpro, which is the same position he previously held with Concentra from 2006 until early 2017.

Concentra maintains that it trained Dr. Toney in the field of occupational medicine and "dedicated significant resources" to him, including continuing medical education.  ECF 1, ¶ 19.  Moreover, Concentra asserts that Dr. Toney "benefitted from Concentra's advertising, goodwill,

––––––––––––––––––––

[6] Defendant asserts that the Medical Advisory Services Program was implemented to service the State Contract awarded to Concentra.  ECF 6-1, ¶ 4.

name recognition, promotional marketing, and sales, administrative, and clerical support." *Id.*, ¶ 20.

## B.  Non-Compete Agreement

Concentra claims that, to "protect its investment" and its proprietary "information", it requires employees "to enter into contracts that contain restrictive covenants." ECF 1, ¶ 21. As a condition of his employment, Dr. Toney executed a Physician Services Agreement.  *See* ECF 1-4.  By its terms, the Agreement had an "Effective Date" of July 30, 2000.  *Id.*

Notably, there is no contention that the Agreement had expired.  Nor was the Agreement tied to a particular employment contract that had otherwise expired.  Indeed, the evidence at the Hearing established that Dr. Toney knew the Agreement was still in effect.  *See* Plaintiff's Hearing Exhibit 2.[7]

Section 6 of the Agreement contains the section titled "Non-Competition," which provides, ECF 1-4, Section 6(c), at 5-6 (bold added):[8]

> <u>Non-Competition</u>. Physician covenants that, during the Employment Term, and, if Physician terminates this Agreement or if Association terminates this Agreement for Cause, for the period of time immediately thereafter set forth on Schedule I (the "Restricted Period"), without the prior written consent of Association, Physician will not, **directly or indirectly, either as an employee**, employer, consultant, agent, principal, partner, stockholder (other than ownership of securities of a publicly held corporation purchased through a broker on an established stock exchange or the Nasdaq system at an original cost of not more than $25,000), corporate officer, director, investor, or financier, or in any other individual or representative capacity, **engage or participate in or consult with**

---

[7] Dr. Toney testified that he was not represented by counsel when he signed the Agreement.

[8] Section 6 of the Agreement contains a restrictive covenant prohibiting the use and disclosure of confidential and proprietary information.  *See* ECF 1-4, § 6(e) at 6.  And, the Agreement addresses non solicitation of employees, patients, customers, and suppliers.  ECF 1-4, § 6(d) at 6.

**any business within the Prohibited Area (as described on Schedule I), or any practice of medicine which is devoted primarily to the practice of occupational medicine within the Prohibited Area, that is in competition with Association's practice, the business of Concentra, and/or the products or services offered by Association and/or Concentra in such area, or engage in any act or activity which would interfere with or harm any business relationship Association and/or Concentra may have with any patient, customer, supplier, employee, or investor. Notwithstanding the foregoing, Physician shall not be prohibited from working as a physician not engaged in the practice of occupational medicine.**

Schedule I of the Agreement defines the Restricted Period as two years. ECF 1-4 at 11. And, the Prohibited Area is defined in Schedule I as "[t]he area within a twenty (20) mile radius of any facility owned, operated, or managed by Association or Concentra, or any Affiliate of Association or Concentra within the State of Maryland." *Id.* at 11. According to Concentra, the Prohibited Area currently encompasses twelve offices in the following locations: Baltimore, Glen Burnie, Columbia, Lanham, Elkridge, Capitol Heights, Beltsville, and Gaithersburg. ECF 1, ¶ 3; ECF 7 at 10.

In its Motion, Concentra seeks to enjoin Dr. Toney from working within a twenty mile radius of any of all twelve of its current locations. ECF 1, ¶ 54; ECF 7 at 10. However, at the time Dr. Toney signed the Agreement, Concentra had only eight locations in Maryland. ECF 12 at 5.[9] Notably, there is no provision in the Agreement that indicates that the parties intended to extend the twenty mile radius to include any future locations established by Concentra.

Further, the Agreement provides that it "shall be construed under and in accordance with the laws of the State of Licensure[.]" *Id.*, Section 8(h) at 9. Maryland is the State of Licensure. *Id.* at 11. And, the Agreement contains a severability clause. *See* Section 6(f).

---

[9] These locations were in the following areas: Baltimore, Lanham, Glen Burnie, Timonium, and Columbia. *See* ECF 19 at 2.

## C. The 2017 State Contract[10]

On January 5, 2016, the Maryland Department of Budget and Management ("DBM") issued a "Request for Proposals" for "State Medical Director and Occupational Medical Services for Maryland State Agencies" ("2016 RFP"). *See* ECF 1-3.[11] The 2016 RFP includes the Contract as "Attachment A". ECF 1-3 at 79. Section 2 of the Contract states that it incorporates the terms of the 2016 RFP. Thus, it appears that the 2016 RFP essentially became the 2017 version of the State Contract. Accordingly, I will sometimes refer to the 2016 State RFP as the 2017 State Contract. The term of the 2017 State Contract is about 5 years. ECF 1-3 at 13, § 1.4.4.

Following a competitive bidding process, the 2017 State Contract was awarded to Workpro. ECF 6-1, ¶ 9. The submissions do not specify precisely when the 2017 State Contract was awarded. But, Workpro assumed the administration of the 2017 State Contract on April 1, 2017. ECF 1, ¶ 2. A few days later, on April 10, 2017, Dr. Toney began to work for Workpro as the SMD – the same position he held since 2006 with Concentra. And, as indicated, Concentra had held the State Contract for the preceding fifteen years.

It is undisputed that, at the time the 2017 State Contract was awarded to Workpro, Dr. Toney worked for Concentra. ECF 2 at 15; *see also* ECF 2-1, ¶ 12. Thus, Workpro was deemed qualified for the award of the 2017 State Contract without the benefit of Dr. Toney as an employee. ECF 1, ¶ 5.

_____

[10] To my knowledge, there are no material distinctions between prior versions of the State Contract and the 2017 State Contract, except where specifically indicated.

[11] Plaintiff avers that the date is June 5, 2016. *See* ECF 1, ¶ 22. However, I have used the date that appears on the 2016 State RFP.

In Section 1.1 of the 2016 RFP, the "Summary Statement," DBM indicated that it was issuing the RFP "to provide State Medical Director (SMD) and Occupational Medical Services, which may be used by all agencies of Maryland State Government . . . .  The current contract and subsequent contract resulting from this RFP are the primary contracts available to State agencies to obtain SMD and Occupational Medical Services . . . ."

Section 1.1.5 of the 2017 State Contract provides, ECF 1-3 at 9:

Maryland County, municipal, and other non-State of Maryland governments or government agencies and not for profit organizations within the State of Maryland may purchase from the Contractor goods or services covered by this Contract at the same prices chargeable to the State. All such purchases by non-State of Maryland governments, government agencies or not for profit organizations:

(1) shall constitute Contracts between the Contractor and that government, agency or organization;

(2) shall not constitute purchases by the State or State agencies under this Contract;

(3) shall not be binding or enforceable against the State; and

(4) may be subject to other terms and conditions agreed to by the Contractor and the purchaser. The Contractor bears the risk of determining whether or not a government, agency or organization with which the Contractor is dealing is a State of Maryland agency.

All Contract prices, terms, and conditions must be provided to any Maryland local government or not for profit organization requesting services under this Contract.

Neither party has clearly identified which State agencies are required to utilize the 2017 State Contract.  But, at a minimum, it appears that the Maryland Department of Transportation, the Maryland Transportation Authority, and the Maryland Transit Administration must utilize the services provided under the 2017 State Contract.  *See* ECF 1-3 at 12, § 1.2, ¶ 40.

As noted, Dr. Toney worked for Concentra as the SMD, and now holds that same position with Workpro. The 2017 State Contract RFP defines "State Medical Director" as follows, ECF 1-3 at 12, § 1.2, ¶ 40 (italics added):

> **State Medical Director (SMD)** – The physician or small centralized group of physicians designated by either the Secretary of Budget and Management or the Secretary of Transportation to exercise all authority vested in Secretaries with respect to medical examinations and investigations relating to employment (including pre and postemployment) with the State Personnel Management System and the Transportation Human Resources System. The SMD shall serve as the Medical Advisor to MDOT, MTA and MdTA. Per COMAR 17.04.03.16, the SMD may designate this authority. The SMD may also designate facilities in which employees are seen by heath care professionals (i.e. nurses, physician assistants, etc.) that are authorized by the SMD (See COMAR 17.04.03.16B (1)) to make medical determinations as related to the services under this Contract. *The SMD still has final authority over all decisions or determinations of medical outcomes.*

The Code of Maryland Regulations ("COMAR"), referenced in § 1.2, is pertinent. Title 17 of COMAR applies to DBM. Subsection 4 applies to Personnel Services and Benefits. COMAR 17.04.03.16(A) states that the SMD "shall exercise all authority vested in the Secretary with respect to medical examinations and investigations relating to employment with the State." Among other things, the SMD shall also "conduct medical examinations of applicants and current employees as provided in State Personnel and Pensions Article ["S.P.P."], §§ 2-302(b)(1)(vi) and 2-303[.]" COMAR 17.04.03.16(B)(2). And, of import, "[t]he determination of the [State] Medical Director in examinations of applicants conducted under…this regulation is final and is not subject to review by the Office of Administrative Hearings ["OAH"]." COMAR 17.04.03.16(C).

Section 3.23 of the 2017 State Contract is titled "Workability Examinations." Section 3.2.3.1 states: "Employees may be referred to the SMD for a comprehensive workability examination." ECF 1-3 at 33. Among other things, Workability Examinations "evaluate the

employee's current medical capabilities and limitations with regard to the job duties of the employee's position. If the employee has medical limitations that prevent the employee from performing assigned job duties," the evaluation must "determine if the employee is medically capable of temporarily performing modified duties, indicate what the specific duty restrictions are, estimate length of modified duty or determine that the limitations are permanent…." *Id.*

Additionally, "[f]or employees with frequent sick leave usage," the examination seeks to "determine if the frequency of use is medically justified based on the nature/severity of the medical condition(s). In some cases, it may be necessary to determine if the employee has a chronic medical condition that has an ongoing and significant impact on the employee's attendance, work performance or ability to perform assigned job duties." *Id.*

By the terms of the 2017 State Contract, an employee must be seen by the SMD or his designee within fifteen days of any agency request. *Id.* And, at a minimum, the examination must include, *inter alia*, a physical examination, personal health history, and a review of relevant medical records. Moreover, under certain circumstances, diagnostic studies and laboratory testing may be performed, as well as follow-up examinations. *Id.* at 34.

The DBM explained the difference between a Workability Examination, performed by the SMD, and an Independent Medical Examination ("IME"), such as for a worker's compensation matter, in a document titled "Questions And Responses #2," issued in conjunction with the 2016 RFP. The DBM said, ECF 12-2 at 5:

> The Workability Exam is only performed by the State Medical Director/Department Medical Advisor as identified on p. 11 and p. 40 of the RFP; and this is very important. The title and authority of the State Medical Director is identified in COMAR 17.04.03.16. The title and authority of the Department

Medical Advisor is identified in COMAR 11.02.06.02.[12] Under COMAR, the determination of the State Medical Director/Department Medical Advisor is "final and not subject to review by the Office of Administrative Hearings." As a result, there are particular actions State agencies can take based on the results of the Workability Exam which they would not be able to take based only on the results of an IME. This is the most important material distinction between an Initial Workability Examination and an Independent Medical Exam.

At the Hearing, Dr. Toney acknowledged the similarity between a Workability Examination, a specific kind of medical examination under the State Contract, and an IME.[13] As Dr. Toney put it, the distinction is one of "impact." In particular, a Workability Examination provides finality, because it is not subject to challenge or review by OAH.

Section 4.4.2.6(e) of the 2017 State Contract is titled "Non-Compete Clause Prohibition." The defense characterizes this provision as a waiver clause. It states, ECF 1-3 at 69 (bold added):

> The Department seeks to maximize the retention of personnel working under this Contract whenever there is a transition of the Contract from one contractor to another so as to minimize disruption due to a change in contractor and to maximize the maintenance of institutional knowledge accumulated by such personnel. To help achieve this objective of staff retention, each Offeror shall agree that if awarded the Contract, the Offeror's employees and agents filling the positions set forth in the staffing requirements….working on the State contract shall be free to work for the contractor awarded the State contract notwithstanding any noncompete clauses to which the employee(s) may be subject. The Offeror agrees not to enforce any noncompete restrictions against the State with regard to these employees and agents if a different vendor succeeds it in the performance of the Contract. To evidence compliance with this noncompete clause prohibition

---

[12] The Department Medical Advisor ("DPA") is a licensed physician who is an employee of the Department or who is contracted by the Department to provide the required Department Medical Advisor services." COMAR 11.02.06.02(A)(1). Among other things, the DPA "conduct[s] medical examinations as provided for under the Department Medical Advisor Policy, and the determination of the Department Medical Advisor in these examinations is the final medical determination[.]"COMAR 11.02.06.02(A)(5).

[13] Both parties seemed to use the phrase "Workability Evaluation" and "Workability Examination" interchangeably.

each Offeror must include an affirmative statement in its technical proposal that the Offeror, **if awarded a Contract,** agrees that its employees and agents shall not be restricted from working with or for any successor contractor that is awarded the State contract.

Dr. Toney claims that, under Section 4.4.2.6(e), Concentra cannot enforce the Agreement. ECF 6 at 16-17. But, plaintiff maintains that, under the plain text of the waiver clause, it is not binding on Concentra, because Concentra was not awarded the 2017 State Contract. Nor was such language included in prior iterations of the State Contract. ECF 2-1 at 17.

### D. Dr. Toney's Departure from Concentra

At the Hearing, Dr. Toney testified that he was approached by Workpro about the SMD position approximately one month after Workpro was awarded the 2017 State Contract. On February 15, 2017, Dr. Toney gave notice of his intent to resign from Concentra, effective April 7, 2017. ECF 1, ¶ 35. According to Dr. Toney, after he gave notice, he was informed by two Concentra employees, Dr. Barry Magnus and Mike Rhine, that "Concentra would not pursue legal action if [he] went somewhere other than WORKPRO. Mr. Rhine told him that 'things could get a little ugly' if I went to WORKPRO." ECF 6-1, ¶ 13.

Dr. Toney completed an employment application for Pivot, dated February 16, 2017. On the application, Dr. Toney disclosed that he was subject to a non-compete agreement with Concentra. Plaintiff's Hearing Exh. 2. He stated, in part, "Occupation [sic] medicine practice restriction with 20 mile radius of [a] Concentra facility for 2 years." *Id.* [14]

---

[14] Dr. Toney indicated that he had already discussed the SMD position with Workpro.

On March 9, 2017, Concentra sent a letter to Dr. Toney, with a copy to the CEO of Pivot. In the letter, Concentra detailed Dr. Toney's obligations under the Agreement. ECF 1, ¶ 37; *see also* ECF 1-5 (March 9, 2017 letter).

Dr. Toney and Workpro, through counsel, responded by letter of March 20, 2017. ECF 1, ¶ 38; *see also* ECF 1-6 (March 20, 2017 letter). Although counsel acknowledged the existence of the Agreement, counsel nonetheless indicated that Dr. Toney would commence employment with Workpro on April 10, 2017. ECF 1-6. Counsel represented that Dr. Toney would serve as the SMD under the 2017 State Contract but, for the first two years of his employment, Dr. Toney would only provide a "limited scope of services" for Workpro, pertaining to "the core technical and oversight services which are exclusive…under the [State] Contract." *Id.* at 3. According to the defense, these are services that Concentra is not permitted to provide under the terms of the 2017 State Contract, and therefore Dr. Toney would not be in competition with Concentra. *Id.*

In addition, defense counsel represented that, during Dr. Toney's first two years of employment, he "will not be providing any type of occupational medicine service in any way (including to any existing or future WORKPRO and affiliate clients) outside of the services that are included in the exclusive [State] Contract." *Id.* Further, during Dr. Toney's first two years of employment at Workpro, he will not provide any "Workers' Compensation Treatment Provider" services. ECF 1-6, at 4; *see also* ECF 6-1, ¶ 16. Workpro did not explain how Concentra would monitor or enforce these representations.

In his Opposition, Dr. Toney reiterated that, for the first two years of his employment at Workpro, he "'will only provide direct service provision or supervision of services that are exclusive to the State Medical Director – services that are not in competition with and cannot be performed by Concentra.'" ECF 6 at 5 (citation omitted).

By letter of April 3, 2017, plaintiff wrote to counsel for Dr. Toney and Workpro, claiming that the Agreement is valid and that Concentra intended to enforce it if Dr. Toney were to work for Workpro. ECF 1, ¶ 39; *see also* ECF 1-7 (April 3, 2017 letter). Defense counsel responded by letter of April 6, 2017, reiterating Dr. Toney's intention to commence employment at Workpro. ECF 1, ¶ 40; *see also* ECF 1-8 (April 6, 2017 letter).

Dr. Toney testified that he commenced employment with Workpro on April 10, 2017. He is employed at a Workpro office located in Elkridge, less than twenty miles from where he worked while employed by Concentra.

Additional facts are included in the Discussion.

## II.    Standard of Review

Rule 65 of the Federal Rules of Civil Procedure governs preliminary injunctions. Under Rule 65(a), a court "may issue a preliminary injunction only on notice to the adverse party." Fed. R. Civ. P. 65(a)(l). The Fourth Circuit has explained, *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999):

> Although Rule 65(a)(1) does not specify what length of notice is required, the Supreme Court has explained that the defendant must be "given a fair opportunity to oppose the application and to prepare for such opposition." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 433 n. 7, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974). Notice on the day of the preliminary injunction hearing itself does not satisfy Rule 65(a)(1). *Id.* By contrast, temporary restraining orders may be issued without full notice, even, under certain circumstances, ex parte. Fed.R.Civ.P. 65(b).

As indicated, at the hearing on April 17, 2017, counsel for the parties agreed to treat the Motion as one for a preliminary injunction. *See Ciena Corp. v. Jarrard*, 203 F.3d 312, 319 (4th Cir. 2000) (explaining that "broad discretion is given to the district court to manage the timing and process for entry of all interlocutory injunctions—both TROs and preliminary injunctions— so long as the opposing party is given a reasonable opportunity, commensurate with the scarcity

of time under the circumstances, to prepare a defense and advance reasons why the injunction should not issue.")

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren.* 553 U.S. 674, 689-90 (2008)); *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 188 (4th Cir. 2013); *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 345 (4th Cir. 2009), *vacated on other grounds and remanded*, 130 S.Ct. 2371 (2010), *reaff'd in part and remanded*, 607 F.3d 355 (4th Cir. 2010). And, it is a remedy that is "'granted only sparingly and in limited circumstances.'" *Micro Strategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991)).

Notably, "[a] plaintiff seeking a preliminary injunction must establish [1] that [it] is likely to succeed on the merits, [2] that [it] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in [its] favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20 (citing *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008); *Amoco Prod Co. v. Gambell*, 480 U.S. 531, 542 (1987); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-12 (1982)); *see also Pashby v. Delia,* 709 F.3d 307, 320 (4th Cir. 2013); *Dewhurst v. Century Aluminum Co.*, 649 F.3d 287, 290 (4th Cir. 2011); *Real Truth About Obama*, 575 F.3d at 345 (applying the standard for preliminary injunctions set forth in *Winter*); *Int'l Refugee Assistance Project v. Trump*, __ F. Supp. 3d ___, 2017 WL 1018235, at *8 (D. Md. Mar. 16, 2017), *appeal filed*, Case No. 17-1351. All four elements must be satisfied. *The Real Truth About Obama, Inc.,* 575 F.3d at 346. And, the "'[p]laintiff bears the burden of establishing that each of these factors supports granting the injunction.'" *Direx Israel*, 952 F.2d at

812 (quoting *Tech. Publ'g Co. v. Lebhar-Friedman, Inc.*, 729 F.2d 1136, 1139 (7th Cir. 1984);

*Shaffer v. Globe Prod, Inc.*, 721 F.2d 1121, 1123 (7th Cir. 1983)); *see Winter*, 555 U.S. at 22

(recognizing that because a preliminary injunction is "an extraordinary remedy," it "may only be

awarded upon a clear showing that plaintiff is entitled to such relief").

### III.    Discussion

### A.  Choice of Law

Both parties assume, without discussing, that Maryland law applies to this dispute.

In *Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007), the Court

said: "Because we sit in diversity in this case, we must apply the substantive law of the forum

state including its choice of law rules."  *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)

("Except in matters governed by the Federal Constitution or by acts of Congress, the law to be

applied in any case is the law of the state.").  Maryland is the forum state.

As to contract claims, Maryland applies the law of the state in which the contract was

formed ("*lex loci contractus*"), unless the parties to the contract agreed to be bound by the law of

another state. *See, e.g.*, *Am. Motorists Ins. Co. v. ARTRA Group, Inc*., 338 Md. 560, 573, 659

A.2d 1295, 1301 (1995).  The Agreement does not specify where it was executed.

Dr. Toney is a Maryland resident and the Agreement concerned his employment with

Concentra in Maryland.  In addition, the Agreement specifies that it "shall be construed under

and in accordance with the laws of the State of Licensure[.]"  ECF 1-4, Section 8(h) at 9.

Maryland is the State of Licensure. *Id.* at 11. "Under Maryland law,[] this Court should presume

that a parties' choice of law is enforceable." *Ledo Pizza Sys., Inc. v. Singh*, 983 F. Supp. 2d 632,

641 (D. Md. 2013) (citing *Meena Enters., Inc. v. Mail Boxes Etc.,* No. DKC 12–1360, 2012 WL

4863695, at *6 n. 8 (D. Md. Oct. 11, 2012)).

For these reasons, and because neither side suggests otherwise, I shall apply Maryland law, to the extent applicable.

## B. Likelihood of Success on the Merits

As noted, the covenant not to compete is contained in the "Physician Services Agreement." ECF 1-4. "To prevail in an action for breach of contract, a plaintiff must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.*, 365 Md. 166, 175, 776 A.2d 645, 651 (2001); *see RRC Northeast, LLC v. BAA Maryland, Inc.,* 413 Md. 638, 658, 994 A.2d 430, 442 (2010).

In other words, "[i]t is the parties' agreement that ultimately determines whether there has been a breach." *Mathis v. Hargrove*, 166 Md. App. 286, 318-19, 888 A.2d 377, 396 (2005). As the Maryland Court of Appeals said in *Polek v. J.P. Morgan Chase Bank, N.A*., 424 Md. 333, 362, 36 A.3d 399, 416 (2012): "Maryland law requires that a plaintiff alleging a breach of contract 'must of necessity allege with certainty and definiteness *facts* showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by defendant.'" (Citation omitted and emphasis in *Polek*); *see also Robinson v. GEO Licensing Co.*, L.L.C., 173 F. Supp. 2d 419, 423 (D. Md. 2001).

### 1. Enforceability of the Restrictive Covenant

Under Maryland law, there are four requirements that must be met to enforce a covenant not to compete. *Medispec, Ltd. v. Chouinard*, 133 F. Supp. 3d 771, 773-74 (D. Md. 2015) (citing *Deutsche Post Global Mail, Ltd. v. Conrad*, 116 Fed. App'x 435, 438 (4th Cir. 2004) (per curiam)). They are, *Medispec*, 133 F. Supp. 3d at 773-74:

> (1) The employer must have a legally protected interest; (2) the restrictive covenant must be no wider in scope and duration than is reasonably necessary to protect the employer's interest; (3) the covenant cannot impose an undue hardship on the employee; and (4) the covenant cannot violate public policy.

*See also Holloway v. Faw, Casson & Co.*, 319 Md. 324, 572 A.2d 510 (1990); *Silver v. Goldberger*, 231 Md. 1, 188 A.2d 155 (1963).

Two of the factors that the Court must consider to determine whether a restrictive covenant is enforceable -- whether the covenant imposes an undue hardship on the employee and whether the covenant violates public policy -- coincide with factors that I must also consider to determine whether injunctive relief is appropriate. To minimize repetition, I will address those two factors in connection with the analysis, *infra*, of the preliminary injunction factors.

The Maryland Court of Special Appeals has instructed, *Ecology Servs., Inc. v. Clym Envtl. Servs., LLC*, 181 Md. App. 1, 15, 952 A.2d 999, 1007 (2008) (citation omitted):

> When a covenant not to compete is reasonable on its face as to both time and space, the factors for determining the enforceability of the covenant based upon the facts and circumstances of the case are:
>
>> whether the person sought to be enjoined is an unskilled worker whose services are not unique; whether the covenant is necessary to prevent the solicitation of customers or the use of trade secrets, assigned routes, or private customer lists; whether there is any exploitation of personal contacts between the employee and customer; and, whether enforcement of the clause would impose an undue hardship on the employee or disregard the interests of the public.

In addition, "restrictive covenants may be applied and enforced . . . against those employees who provide unique services, or to prevent the future misuse of trade secrets, routes or lists of clients, or solicitation of customers." *Becker v. Bailey*, 268 Md. 93, 97, 299 A.2d 835, 838 (1973); *see also Millward v. Gerstung Int'l Sport Ed., Inc.*, 268 Md. 483, 489, 302 A.2d 14, 17 (1973). In *Millward*, 268 Md. at 488–89, 302 A.2d at 17 (internal quotation marks and citation omitted, alteration added), the Maryland Court of Appeals recognized:

> [T]here is a distinction

> between the cases where business success is attributable to the quality of the product being sold, and those where the personal contact of the employee with the customer is an important factor. In the latter case, the employer has a stronger need for protection against diversion of his business to the former employee who has had personal contacts with customers which the employer lacks.

From 2006 until 2017, Dr. Toney occupied the positions at Concentra of Medical Director for Medical Advisory Services and SMD under the State Contract. As indicated, the SMD is the physician charged under the State Contract with performing Workability Examinations for certain injured State workers. ECF 1, ¶ 23. Employees in need of such services are referred to the SMD by the State agencies that are subject to and bound by the State Contract. *Id.* However, other State and local agencies, as well as non-profits (the "Non-Exclusive Entities"), may elect to use the State Contract to obtain Workability Examinations for their employees. If so, the SMD cannot refuse to provide those services.

As Concentra puts it, "all state agencies may use the State Contract for [their] Occupational Medicine needs, [but] not all state agencies are required to do so by the terms of the [State Contract]." ECF 1, ¶ 24. Rather, the Non-Exclusive Entities are also "free to use a different provider for Occupational Medicine services." *Id.* In that circumstance, however, the examination would be an IME, rather than a Workability Examination.

Further, Concentra contends: "As a result of [Dr. Toney's] skills and reputation in this area, employers other than the Maryland state agencies covered by the State Contract hired Concentra to have Toney perform such evaluations on their employees." *Id.*, ¶ 5. Concentra suggests that these Non-Exclusive Entities might follow Dr. Toney to Workpro, even though they are not required to utilize Workpro.

Concentra also asserts: "Toney's role as State Medical Director is unique, distinct, and highly marketable to Non-Exclusive Entities and private employers who may be seeking to

engage an Occupational Medicine provider." ECF 7 at 4. Concentra suggests that Dr. Toney "was in a position to establish a personal relationship with [Concentra's] clients," and thus "it could be anticipated that those clients would follow him." *Holloway*, 319 Md. at 335, 572 A.2d at 516.

In my view, Concentra has met the first element to justify enforcement of the covenant not to compete. It has set forth a legally protected interest.

As to the second element, scope and duration, the Agreement provides that the length of the non-compete term is two years. "Maryland has consistently upheld two year limitations on employment with competitors as reasonable." *Padco Advisors, Inc. v. Omdahl*, 179 F. Supp. 2d 600, 606 (D. Md. 2002). Thus, under *Padco*, 179 F. Supp. 2d at 606, the duration is reasonable.

The covenant must also contain a reasonable geographic restriction. With respect to the geographic limitation of a twenty-mile radius from any of Concentra's locations in Maryland, twenty miles, on its face, appears reasonable.

*Maternal-Fetal Med. Assocs. of Md., LLC v. Stanley-Christian*, No. 0967 Sept. 2009, 2013 WL 3941970 (Md. Ct. Spec. App. July 24, 2013) (unpublished), is instructive. In that case, the Maryland Court of Special Appeals affirmed the enforcement of a non-compete agreement against a doctor. The non-compete agreement restricted the doctor from practicing medicine in Montgomery County, Maryland; Northwest Washington, D.C.; and/or within a 20-mile radius of any of the three offices maintained by the plaintiff. *Id.* at *2. The court determined that "the geographical scope of the Non–Competition Provision, twenty miles, is quite limited…" *Id.* at *17.

Similarly, in *Ruhl v. F. A. Bartlett Tree Expert Co.*, 245 Md. 118, 225 A.2d 288 (1967), the Maryland Court of Appeals upheld the geographical restriction prohibiting the defendants

from working for a competing business in five Maryland Eastern Shore counties and the adjoining Delaware county, because that was the area in which the employee worked for the company. *Id.* at 128-129.

As noted, Concentra now has twelve locations in Maryland, in the following areas: Baltimore, Glen Burnie, Columbia, Lanham, Elkridge, Capitol Heights, Beltsville, and Gaithersburg. ECF 7 at 10. A map provided by Concentra reveals that, based on those locations, the geographic scope of the non-competition agreement would not foreclose Dr. Toney from practicing Occupational Medicine throughout a large area of the State. *Id.* at 11. Moreover, under the terms of the Agreement, there are no restrictions – as to either time or place – as to any field of medicine, other than Occupational Medicine.

The twenty mile radius also appears reasonable in light of the State-wide scope of Dr. Toney's employment activities. Dr. Toney served as the SMD for the entire State of Maryland. As a result, he "received patient referrals from entities operating throughout the entire state." ECF 2-1 at 14-15.

Judge Russell of this Court has said: "When a company competes for business on a national and international level, 'a restrictive covenant limited to a narrow geographic area would render the restriction meaningless.'" *Allegis Grp., Inc. v. Jordan*, No. CIV.A. GLR-12-2535, 2014 WL 2612604, at *6 (D. Md. June 10, 2014) (quoting *Intelus Corp. v. Barton*, 7 F.Supp.2d 635, 642 (D. Md. 1998)). Judge Russell concluded, *Allegis Grp., Inc.*, 2014 WL 2612604, at *6: "Because [plaintiff] competes for business on a national and international level, the provision's prohibition of competition throughout the United States and Canada is reasonable."

At the time Dr. Toney signed the Agreement, however, Concentra had only eight locations in Maryland. ECF 19; *see also* ECF 12 at 5; ECF 14-1 (Supplemental Affidavit), at 1. Thus, the question arises as to whether Concentra is entitled to enforce that twenty-mile radius as to all twelve of its current locations.

The Agreement does not expressly provide that Dr. Toney is prohibited from working within twenty miles of any future, unknown Concentra locations that might come into existence due to growth and expansion of Concentra. Put another way, Dr. Toney did not agree to an open-ended restriction that would include offices of Concentra not yet in existence when the Agreement was executed.

In my view, it would be unreasonable to conclude that in 2000, when Dr. Toney signed the Agreement, he agreed to a restrictive covenant with a twenty mile radius from Concentra locations not then in existence. *Cf. New Atlanta Ear, Nose & Throat Assocs., P.C. v. Pratt*, 253 Ga. App. 681, 685, 560 S.E.2d 268, 271 (Ga. App. 2002) (noting that territorial restrictions that change and expand during the course of an agreement are subject to invalidation). Accordingly, it is likely that the restrictive covenant is only enforceable as to the twenty mile radius with respect to the eight locations in existence at the time that Dr. Toney signed the Agreement. These locations were in the following areas: Baltimore, Lanham, Glen Burnie, Timonium, and Columbia. ECF 19 at 2.

At the Hearing, Concentra also argued that the Agreement bars Dr. Toney from performing services for any Workpro location within the Restricted Area, even if Dr. Toney himself is located outside of the twenty mile radius. At this preliminary stage, I do not read the Agreement so broadly.

As discussed, *infra*, the restrictive covenant does not impose an undue hardship on Dr. Toney, nor does it violate the public interest.

Accordingly, I conclude that the non-compete at issue here is likely enforceable.

## 2. Waiver

Dr. Toney contends that, pursuant to the 2016 RFP, Concentra waived the restrictive covenant. ECF 6 at 16. The contention is specious.

As noted, to submit a bid for the 2017 State Contract, the offeror had to "agree that *if awarded* the Contract, the Offeror's employees and agents filling the positions set forth in the staffing requirements….working on the State contract shall be free to work for the contractor awarded the State contract notwithstanding any noncompete clauses to which the employee(s) may be subject." Section 4.4.2.6(e) of 2016 RFP, ECF 1-3 at 69 (emphasis added). However, Concentra lost its bid for the 2017 State Contract. Therefore, it is not subject to or bound by this term of the 2016 RFP. Nor was this waiver language included in the prior iterations of the State Contract that Concentra performed. ECF 2-1 at 17.

## 3. Breach of the Restrictive Covenant

The Court must consider whether Concentra is likely to establish a breach of the restrictive covenant.

Notably, Concentra alleges: "Toney has accepted a role with a direct competitor of Concentra's to perform the exact same occupational medicine services that he provided for Concentra." ECF 2-1 at 17. At the Hearing, Dr. Toney testified that he is now working for Workpro, in the field of occupational medicine, at a location in Elkridge, Maryland. He admitted that his Workpro office is less than twenty miles from where he worked while employed at Concentra.

Defendant attempts to argue that Dr. Toney has not breached the covenant because his work as SMD is not in competition with Concentra, in that the services provided under the 2017 State Contract are exclusive to Workpro. ECF 6 at 1-2. But, as discussed, *infra*, this argument is based on a strained interpretation of the meaning of "competition."

The most reasonable reading of the non-compete clause bars Dr. Toney from working for a competitor of Concentra, in the field of occupational medicine, within the prescribed radius. Even if, for two years, Dr. Toney only performs services as the SMD under the 2017 State Contract awarded to Workpro, Concentra is likely to establish that Dr. Toney has breached his Agreement by working within the Restricted Area for a competitor of Concentra in the field of occupational medicine.

## C. Irreparable injury in the absence of preliminary relief

"Irreparable harm is suffered when monetary damages are difficult to ascertain or are inadequate." *Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.,* 22 F.3d 546, 551 (4th Cir.1994) (citation omitted). This can occur when there is a threat of a loss of customers or the loss of goodwill. Plaintiff contends that it will suffer the loss of customers and damage to the intangible of goodwill.

In *BAA, PLC v. Acacia Mut. Life Ins. Co.*, 400 Md. 136, 164 n. 24, 929 A.2d 1, 18 n. 24 (2007), the Maryland Court of Appeals defined goodwill as follows (quoting *Detter v. Miracle Hills Animal Hosp., P.C.,* 269 Neb. 164, 171, 691 N.W.2d 107, 113 (2005)):

> "[T]the advantage or benefit which is acquired by an establishment beyond the mere value of the capital, stock, funds, or property employed therein, in consequence of the general public patronage and encouragement which it receives from constant or habitual customers, on account of its local position or common celebrity, or reputation for skill or affluence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices."

*See also Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 555–56 (1993) (explaining, in an unrelated context: "Although the definition of goodwill has taken different forms over the years, the shorthand description of good-will as 'the expectancy of continued patronage,' provides a useful label with which to identify the total of all the imponderable qualities that attract customers to the business.")

Chief Judge Blake's discussion in *Corporate Healthcare Financing, Inc. v. BCI Holdings*, CCB-05-3391, 2006 WL 1997126 (D. Md. 2006), provides guidance on the issue of irreparable harm. In *BCI Holdings*, Judge Blake observed: "'[W]hen the failure to grant preliminary relief creates *the possibility* of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied.'" *Id.* at *4 (alteration and emphasis added) (quoting *Multi-Channel TV Cable Co. v*, 22 F.3d at 551). Further, she stated: "In describing the legitimate business interests an employer can protect through a restrictive covenant, the Maryland Court of Appeals has stated that '[p]ersons in business have a protectable interest in preventing an employee from using the contacts established during employment to pirate the employer's customers.'" *Id.* (quoting *Holloway*, 319 Md. at 335, 572 A.2d at 515).

Notably, "[t]his interest is strongest for businesses in which the personal contacts between the employee and the customer are an important element determining the business's success." *Intelus Corp. v. Barton*, 7 F. Supp. 2d 635, 639 (D. Md. 1998); *see also Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley*, 756 F.2d 1048, 1055 (4th Cir. 1985) (recognizing that the loss of customers can constitute "irreparable, noncompensable harm."); *see also Silver v. Goldberger*, 231 Md. 1, 7, 188 A.2d 155, 158 (1963) ("There is a line of cases which holds that *restraint is justified* if a part of the compensated services of the former employee consisted in the

creation of the good will of customers and clients which is likely to follow the person of the former employee.") (emphasis in original). On the other hand, "[a] restrictive covenant is not enforceable if its sole purpose is to prevent a company's employees from joining another company, thereby making the new company a more efficient competitor." *MCS Servs., Inc. v. Jones*, No. CIV.A WMN-10-1042, 2010 WL 3895380, at *3 (D. Md. Oct. 1, 2010) (citing *Holloway*, 319 Md. at 335, 572 A.2d at 515).

As has been established, the nature of the medical examination governed by the State Contract is known as a Workability Examination. The parties agree that only the SMD may perform that precise evaluation, and by law only that particular examination provides the feature of finality, meaning that is not subject to review by OAH. COMAR 17.04.03.16(C). But, apart from finality, an independent medical examination is virtually the same as a Workability Examination.

Dr. Toney insists that Concentra's concern about loss of goodwill or customers is not relevant. He argues that his occupational medicine duties at Workpro are not in competition with Concentra because only the SMD can perform a Workability Examination, and only those specific evaluations enjoy the finality conferred by COMAR 17.04.03.16(C). *See* ECF 12 at 7. Focusing on the distinction between an IME and a Workability Examination, Dr. Toney asserts, ECF 12 at 7:

> [A]n IME could be contested and ultimately litigated before the Workers' Compensation Commission. But, if a governmental entity wants an examination of an employee that is "final and not subject to review" it must have the examination performed by the SMD. As Concentra can no longer provide the final and nonreviewable Workability Examination services, Dr. Toney will not be competing against Concentra.

Because only Workpro can provide an examination with the finality conferred by COMAR, Dr. Toney maintains that "entities may choose to utilize the services" of the SMD (at

Workpro) under the 2017 State Contract, "which has nothing to do with Dr. Toney." ECF 12 at 7. He also argues that entities would choose to utilize Workpro, rather than Concentra, because they "would receive 'most favored nation' status as they would receive the same pricing that is charged to the State[.]" *Id.* at 8.

Dr. Toney also insists that "[he] will only be performing services for the next two years that are specific to the 2017 [State] Contract awarded exclusively to WORKPRO." ECF 6 at 16. Additionally, Dr. Toney represents that, during the two-year restrictive period, he will not be providing any type of occupational medicine service in any way (including to any existing or future WORKPRO and affiliate clients) outside of the services that are included in the exclusive 2017 [State] Contract." *Id.*

Concentra points out that, when Workpro was a defendant in the case, it provided no indication of how this promise would be enforced. In its view, Workpro has asserted, "trust us." ECF 7 at 5.[15]

As noted, Section 1.1.5 of the 2017 State Contract provides, ECF 1-3 at 9 (emphasis added): "Maryland County, municipal, and other non-State of Maryland governments or government agencies and not for profit organizations within the State of Maryland may purchase from the Contractor goods or services covered by this Contract at the same prices chargeable to the State…. *All Contract prices, terms, and conditions must be provided to any Maryland local government or not for profit organization requesting services under this Contract.*"

---

[15] At the Hearing, counsel for defendant asserted that this promise is incorporated in Dr. Toney's contract with Workpro. That contract was not introduced in evidence, however. In addition, the defense stated that Dr. Toney would agree to the entry of an Order limiting him, for a period of two years, to work solely in connection with the 2017 State Contract.

As previously explained, certain State agencies are required to use the 2017 State Contract. But, many State agencies have a choice. The Non-Exclusive Entities may opt to use the 2017 State Contract, for occupational medicine needs, but are not required to do so. However, when Non-Exclusive Entities elect to utilize the State Contract, Workpro is contractually obligated under the State Contract to perform the services for such Non-Exclusive Entities.

Concentra claims that Dr. Toney previously performed work for entities that were not required to use the State Contract, but could elect to do so. According to Concentra, "in 2016 more than 10% of Concentra's workability evaluations were for clients outside of the scope of the State Contract." ECF 1, ¶ 5. Specifically, Concentra alleges that Baltimore County Public Schools and Howard County Public Schools "contract[] with Concentra separately from the State Contract, and [have] heavily used Toney's workability services…. These two contracts *alone* generate over a million dollars in revenue for Concentra each year." ECF 1, ¶ 25.[16] Concentra also claims that its "'workability clients have become dependent on Toney to provide a comprehensive report, prognosis, and recommendations on issues of fitness, impairment or disability.'" ECF 2-1 at 19-20 (citation omitted).

Put another way, Concentra argues that customers not bound by the 2017 State Contract, *i.e.*, the Non-Exclusive Entities, need not utilize Workpro. Instead, they could choose Concentra to perform an IME. But, these clients may be drawn to Workpro because of their relationship with or familiarity with Dr. Toney, and Dr. Toney would then be required to perform services for

---

[16] Concentra did not introduce these contracts at the hearing.

such clients, in accordance with the terms of the 2017 State Contract. On the other hand, without Dr. Toney at Workpro, those clients might choose to retain Concentra to perform an IME.

Concentra adds, ECF 7 at 3 (final italicization added):

Non-Exclusive Entities like Baltimore County and Howard County, both of which generated hundreds of thousands of dollars in annual fees for Concentra, may choose to have their workability evaluations fulfilled by the State Contract vendor (previously by Toney at Concentra and now, it appears, by Toney at Workpro) at the same prices chargeable to the State, *or may choose to utilize a competitor for such services*. (*See* Ex. C. to Compl. at p. 8, ¶ 1.1.5).

Further, Concentra asserts: "Despite losing the State Contract, Concentra is currently performing workability evaluations for certain of these Non-Exclusive Entities." ECF 7 at 3. It argues that because Dr. Toney previously conducted workability evaluations for these same Non-Exclusive Entities while he was employed at Concentra, "there is an extreme risk and likelihood that these Non-Exclusive Entities will change providers, leave Concentra, and follow Toney to Workpro. *Id.* at 3-4. It posits, *id.* at 4: "The damage to Concentra from the flight of this business is incalculable." *Id.* at 3-4.

To be sure, a Workability Examination may only be performed by the SMD, in accordance with the 2017 State Contract. Dr. Toney is correct that Concentra can no longer perform precisely the same service as Workpro, *i.e.*, Workability Examinations, because only the SMD can perform them. And, only such examinations offer the feature of finality. Nevertheless, Dr. Toney's position that he and Workpro are not in competition with Concentra for the business of the Non-Exclusive Entities, because of the difference between an IME and a Workability Evaluation, turns on an exceedingly narrow interpretation of the word "competition." According to Dr. Toney, companies are not in competition unless they can produce the exact same product or perform the identical service.

To illustrate, under Dr. Toney's construct, the National Railroad Passenger Corporation, commonly known as Amtrak, a medium and long-distance train service, would not qualify as a competitor of the "Maryland Area Regional Commuter" ("MARC"), although both service the Baltimore–Washington, D.C. corridor, because Amtrak provides amenities such as food, wireless internet, and, business class seating, not offered by MARC.  Nonetheless, Amtrak undoubtedly competes with MARC for passengers in the Baltimore and Washington, D.C. corridor.

The defense seems to assume that every client regards the feature of finality as paramount.  Just as a customer may prefer to take the MARC train because it is less expensive or runs more frequently, a customer may prefer an IME rather than a Workability Examination, for a host of reasons.  These could include cost; a lack of concern as to finality; a preference for the services of the particular physician; and the convenience of the location.  A client might well value Dr. Toney's "reputation and qualifications" as the SMD for many years and for that reason follow him to Workpro, giving Workpro an unfair, competitive advantage.  This is especially so if the provider established a business relationship, trust, and goodwill with the client.  *Millward*, 268 Md. at 489, 302 A.2d at 17 (holding that a non-competition covenant was enforceable based, in part, on the unique reputation and qualifications of the employee, a locally renowned former coach of a professional soccer team).

At this preliminary stage of litigation, I am satisfied that Concentra has shown that it is likely to lose business from Non-Exclusive Entities once these entities learn that Dr. Toney has commenced employment at Workpro.  It has also established that it is likely to lose this business because of the relationships Dr. Toney has developed with the Non-Exclusive Entities and because of the reputation that Dr. Toney has developed in his role as SMD since 2006.  Under

Maryland law, this likelihood of loss of business qualifies as irreparable harm. *See, e.g.*, *Bradley*, 756 F.2d at 1055.

### D. Balance of Equities

If a plaintiff demonstrates a likelihood of irreparable harm to itself, "the court must then balance the likelihood of harm to the plaintiff against the likelihood of harm to the defendant." *Corporate Healthcare Financing*, *supra*, 2006 WL 1997126, at *4 (citing *Safety–Kleen, Inc. (Pinewood) v. Wyche,* 274 F.3d 846, 858–59 (4th Cir. 2001); *Direx Israel*, 952 F.2d at 812)). In my view enforcement of the Agreement would not cause undue hardship to Dr. Toney.

The restrictive covenant applies to only one field of medicine: occupational medicine. Significantly, Dr. Toney is not precluded from working as a doctor anywhere in the State, so long as it is not in the field of occupational medicine. Moreover, he is not barred from working for Workpro as the SMD, so long as he works outside the twenty mile radius. And, outside the twenty mile radius, Dr. Toney is entitled to practice occupational medicine. In other words, with the exception of the practice of occupational medicine, there are no restrictions on Dr. Toney at all, either as to location or duration.

At the Hearing, Dr. Toney described his work as "unique." In his Supplemental Opposition, Dr. Toney asserts that, given "the highly specialized occupational medicine he practiced as SMD, it seems extremely unlikely that he can find comparable employment." ECF 12 at 9.

Notably, Dr. Toney is a board-certified family practitioner. ECF 14-1 at 1; ECF 2-1 at 16. Nevertheless, he argues, ECF 6 at 18:

> While Concentra suggests that Dr. Toney could find alternative employment in family medicine, it fails to take into account the fact that he has not practiced family medicine for 15 to 16 years and undertakes no analysis of what impact that would have on his prospects…Moreover, Plaintiff asserts that Dr. Toney could

practice occupational medicine provided it was not within a twenty-mile radius of any Concentra facility, but offers no facts regarding such opportunities.

In contrast, Concentra argues: "There are dozens – if not hundreds – of openings available in Maryland for a physician with Toney's credentials." ECF 1, ¶ 4 (citing Affidavit of Rachel Rempfer-Hill, Clinician Recruiting Manager for the Midwest and East Zone of Concentra, ECF 1-2). Ms. Rempfer-Hill formed her opinion on the basis of Dr. Toney's professional experience and her "knowledge of the regional market for medical careers[.]" *Id.* at 2.

The evidence showed that Dr. Toney never launched a job search after Concentra lost its bid for the 2017 State Contract. While Concentra was attempting to develop a business plan that would provide for Dr. Toney's continued employment, notwithstanding the loss of the 2017 State Contract (*see* ECF 1-1; *see also* Plaintiff's Hearing Exhs. 3 and 4), Dr. Toney was approached by Workpro, soon after Workpro was awarded the 2017 State Contract. Thus, there was no need for Dr. Toney to search for a new job.

Yet, in March 2016, Dr. Toney had obtained a job offer from the Pentagon. *See* Plaintiff's Hearing Exh. 1. He described it as mostly administrative. Ultimately, Dr. Toney turned down that position because Concentra increased his salary.

In sum, this is not a case where a person "with a family to support [will] be precluded from engaging in the only business which he knows in the area in which he grew up and where he lives." *Ruhl*, 245 Md. at 128, 225 A.2d at 293. In my view, the burden of hardship on Dr. Toney is not undue given the limited scope of the covenant, his level of administrative experience, and his board certification in family medicine.

Accordingly, the balance of equities "tips decidedly" in favor of the plaintiff. *Direx Israel,* 952 F.2d at 814.

## E.  Public Interest

Dr. Toney argues that the public interest prong weighs in his favor.  He states, ECF 6 at

18-19 (quoting section 4.4.2.6(e) of 2016 RFP for the 2017 State Contract, ECF 1-3 at 69):

> It seems rather axiomatic that there is strong public interest in permitting a
> physician to provide services to the State pursuant to an exclusive State contract
> that was awarded through a competitive bidding process. If that is not enough,
> there is also a public interest in the State seeking "to maximize the retention of
> personnel working under this Contract whenever there is a transition of the
> Contract from one contractor to another so as to minimize disruption due to a
> change in contractor and to maximize the maintenance of institutional knowledge
> accumulated by such personnel."

The State awarded the 2017 State Contract to Workpro while Dr. Toney was still

employed by Concentra.  Presumably, then, the State believed that Workpro was able adequately

to perform the 2017 State Contract without the services of Dr. Toney.

I agree with Concentra that defendant "cannot claim that the public interest will be

harmed should Toney be enjoined from breaching the Agreement, after having assured the State

that it is capable of performing the State Contract without him." ECF 7 at 13.  This is not a case

where a significant public need will be unmet if the covenant is enforced.  *See, e.g.*, *Maternal-*

*Fetal Med. Assocs. of Md., LLC*, 2013 WL 3941970, at *18 ("Nor can we say that the covenant

disregarded the interests of the public because the record does not indicate that there was a

significant unmet need for perinatologists within the twenty mile restricted area.").

Moreover, in general, "the public has an interest in the enforcement of reasonable

restrictive covenants." *Intelus,* 7 Supp.2d at 642.  This is because "[r]estrictive covenants can

play an important role in the growth of a business that depends upon the development of good

will through effective customer service." *Id.*

In my view, this factor weighs in favor of Concentra.

## F. Bond Requirement

Concentra initially asked the Court to waive the requirement of a bond during the pendency of the temporary restraining order and preliminary injunction. ECF 2-2 at 3.

Fed. R. Civ. P. 65(c) provides: "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." This rule "is mandatory and unambiguous." *Hoechst Diafoil Co.*, 174 F.3d at 421 (4th Cir.1999). Ordinarily, "failure to require a bond upon issuing injunctive relief is reversible error." *Id.* Although a court "is not free to disregard the bond requirement altogether," a court "has discretion to set the bond amount 'in such sum as the court deems proper.'" *Id.*

Accordingly, I may not waive the bond requirement.

"Security [under Fed. R. Civ. P. 65(c)] is generally fixed in an amount covering 'the potential incidental and consequential costs' as well as either the losses the wrongly enjoined party will suffer or the amount of the complainant's unjust enrichment during the period of prohibited conduct." *Metro. Reg'l Information Sys., Inc. v. Am. Home Realty Network, Inc.*, 904 F.Supp.2d 530 (D.Md.2012) (quoting *Hoechst*, 174 F.3d at 421).

Defendants argue that the bond amount should be set at $285,900, the amount of Dr. Toney's yearly compensation package at Workpro. ECF 12 at 10. In the exercise of my discretion, I shall set a bond requirement in the amount of $250,000.

### IV.   Conclusion

The Court has weighed the requisite factors and concludes that Concentra has shown that it is entitled to a preliminary injunction.  An Order follows.

Date: April 28, 2017                                    _____/s/_____
                                                                            Ellen Lipton Hollander
                                                                            United States District Judge